## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LIBERTY TOWERS, LLC** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ZONING HEARING BOARD OF** | : | **NO. 10-7149** |
| **FALLS TOWNSHIP, BUCKS COUNTY,** | : | |
| **PENNSYLVANIA** | : | |

## MEMORANDUM OPINION

**Savage, J.**                                                    **December 6, 2011**

Pursuant to section 332(c) of the Telecommunications Act of 1996 ("TCA"),[1] Liberty

Towers, LLC ("Liberty") seeks reversal of the decision of the Falls Township Zoning

Hearing Board ("Board") denying Liberty's application for a use variance to construct a

telecommunications facility on land zoned for residential use.  Liberty contends that the

Board's denial of its application for a use variance violates the TCA because the decision

was not supported by substantial evidence, in violation of 47 U.S.C. § 332(c)(7)(B)(iii), and

it has the effect of prohibiting the provision of personal wireless services, in violation of 47

U.S.C. § 332(c)(7)(B)(i)(II).

The cross-motions for summary judgment implicate the TCA's attempt to balance

the competing interests of the national government's policy of enhancing competition in the

telecommunications industry and the local government's ability to regulate land use.  We

must determine whether Falls Township applied its zoning law appropriately, without

having "the effect of prohibiting the provision of personal wireless services" in violation of

---

[1] 47 U.S.C. § 332(c)(7)(B)(v) allows "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph [to], within 30 days of after such action or failure to act, commence an action in any court of competent jurisdiction."

47 U.S.C. § 332(c)(7)(B)(i)(II).

We shall deny Liberty's motion for summary judgment and grant the Township's motion.[2] Liberty presented no evidence demonstrating that the site of the proposed facility met the legal requirements for a use variance. On the contrary, it conceded that the property was being used as zoned. Thus, the Board's application of local zoning law to deny Liberty's variance request was supported by substantial evidence.

Liberty also failed to carry its burden to demonstrate that the Board's decision has the effect of prohibiting the provision of personal wireless services. Liberty has not established that any carriers, including those intending to use the proposed facility, have a significant gap in service in the area surrounding the proposed site. Nor has Liberty shown that the proposed facility is the least intrusive.

### Factual and Procedural Background

Liberty is seeking a use variance to construct a telecommunications facility for four wireless carriers – Clearwire, MetroPCS, Sprint, and T-Mobile ("Carriers") – to provide wireless service to the general public near the subject property in Falls Township. The proposed facility is a 150-foot-high galvanized steel monopole or tower within an 80 x 80 foot compound surrounded by an eight-foot-high chainlink fence. Inside the fenced area would be equipment cabinets on concrete pads and coaxial cables connecting the cabinets to the numerous antennas. The antennas would be attached to the monopole at various heights, ranging from 115 feet to 145 feet. A steel lunar platform, a large triangular

---

[2] The parties agreed to submit the case on cross-motions for summary judgment, relying on the record created at the public hearing before the Board. *Falls Township Report of Rule 26(f) Meeting* at 1; *Report of Liberty Towers for Rule 26(f) Meeting* at 1.

structure, would be attached near the top of the monopole.

The site of the proposed facility ("property") is a 1.05-acre parcel located in a Neighborhood Residential Conservation ("NCR") zoning district that permits single-family use only.  The purpose of the NCR zoning district is "to retain the character of existing single-family residential areas."  Falls Township Zoning Ordinance, § 209-20.  There is currently a single-family dwelling on the property.

Because the proposed use is not permitted in the NCR zoning district, Liberty applied for a use variance.  Because the shape of the property and the location of the proposed facility near the edge of the property line required a variance, Liberty also applied for a dimensional variance.[3]

On November 9, 2010, the Board held a hearing on Liberty's application for the use and dimensional variances.  At the hearing, Liberty called three experts: Brian Seidel, a certified land-use planner; Mark Damiano, a civil and structural engineer; and Michael Fischer, a radio frequency engineer.

Seidel acknowledged that the Township had planned for towers, creating "several zoning designations where towers are in fact permitted."[4]  He testified that there are three geographic areas near the proposed site where a tower would be permitted as a conditional use.  These areas include one group of properties zoned as limited industrial and two properties composing separate institutional zones.[5]

---

[3] The Board did not address Liberty's dimensional variance application because the dimensional variance issue was rendered moot by the denial of the use variance.  R. 187.

[4] *Id.* at 115.

[5] *Id.* at 110-13.

3

Seidel testified that all the properties in the limited industrial area were considered as potential towers sites; but, to his knowledge, no owner was interested in housing the tower.[6]  Seidel also testified that Liberty considered the two properties located in separate institutional zoning areas, including one adjacent to the proposed site.  However, the owners of the two properties were not interested in having a monopole on their property.[7]  Neither he nor any other witness offered any specifics about Liberty's discussions with the property owners.

Seidel conceded that the property on which Liberty intends to construct the facility may be used as zoned.  Indeed, there is a single-family home on the property, a permitted use under the zoning classification.[8]

Fischer opined that there are no tall structures available that would enable the Carriers to serve the area surrounding the proposed site.[9]  There are, however, two structures within a mile of the site, a 130-foot water tower and a 60-foot monopole operated by T-Mobile.  There is no evidence that Liberty or the Carriers contacted the owner of the water tower or determined whether the T-Mobile monopole could be

---

[6] *Id.* at 111.

[7] *Id.* at 112-13.

[8] *Id.* at 149-50.

[9] The parties dispute whether there are structures within a half-mile upon which the Carriers could place their antennas.  According to the hearing transcript, Fischer testified: "You can actually see there are a number of structures in the area within a half mile."  *Id.* at 135.  The Township relies on this testimony to argue that there are structures within a half-mile of the proposed site.  Liberty contends that "there was an error in the transcript of Michael Fischer's testimony."  Instead, Liberty maintains that "the structures referred to by Mr. Fischer are *not* within a half-mile radius of the site, but slightly within *one mile* of the proposed site."  Based on Fisher's radiofrequency design report and a map he presented during the zoning hearing, *id.* at 44, 47, it appears there are no tall structures within a half-mile of the site.  There are, however, two tall structures less than a mile from the property, a 130-foot water tower and a 60-foot monopole.  Whether there are tall structures within a half-mile or one mile is not material.  As Fischer testified during the zoning hearing, it is only outside of two miles from a facility that T-Mobile and MetroPCS cannot transmit.  *Id.* at 135.

4

extended.

Called to address the reliability of coverage, Fischer used propagation maps provided by the Carriers to illustrate wireless signal strength in the area surrounding the property. The T-mobile maps, for example, identify three thresholds of coverage based on what a given carrier considers reliable: in-building, in-vehicle, and "unreliable" coverage. In-vehicle coverage includes coverage for customers using wireless devices in vehicles or outdoors.[10]

The reliability test as used by Liberty is undefined and subjective. According to Fischer's Radiofrequency Design Report, reliable coverage "is defined to be the ability of a remote user of wireless services to connect with the landbased national telephone network and to maintain a connection capable of supporting a reasonably uninterrupted conversation."[11] The record does not disclose what metric Fischer or the Carriers used in quantifying "reliable coverage." One cannot gauge how many or what percentage of dropped or unsuccessful calls constitutes unreliable coverage. Moreover, the thresholds for in-building, in-vehicle, and "unreliable" coverage contain "a margin of safety" to ensure "a higher level of reliability and clearer reception under all reasonable conditions."[12]

According to Fischer, the map provided by T-Mobile depicting its existing coverage demonstrated that T-Mobile does not currently have reliable in-building coverage in the

---

[10] *Id.* at 137.

[11] *Id.* at 43. According to Fisher's Report, reliable coverage is not limited to voice, but also includes data. Incorporation of data usage into the definition of reliable coverage does not alter the analysis. Based on Fischer's report, it appears that connectivity and download speeds for data deteriorate at the same signal strength that cell phone calls become unreliable.

[12] *Id.* at 44.

area around the proposed location.  He admitted that "[f]or T-Mobile there is [sic] not many areas of unreliable in vehicle coverage."[13]  Fischer also stated that T-Mobile has an area of unreliable coverage "along Lower Morrisville Road," indicated by a white area on the map.[14]  Fischer also presented a map predicting T-Mobile's coverage after installation of the monopole.  The monopole, according to projections, would eliminate the area of unreliable coverage, providing area residents[15] with reliable in-building coverage.

Fischer also presented maps provided by MetroPCS.  Unlike the two T-Mobile maps, the two MetroPCS maps do not differentiate between in-building and in-vehicle coverage.  Instead, they show only a green and white area.  Although there is no legend explaining the colors on the maps, Fisher explained that the green area shows reliable coverage and the white area shows unreliable coverage.[16]  Several roads, including Route 13, New Tyburn Road, and New Falls Road, and the residential area surrounding the property are included in the white area.  MetroPCS predicts that the monopole would eliminate some of the area of unreliable coverage.  However, Route 13 and New Tyburn Road would still have areas of coverage the carrier considers unreliable.

Fischer summarized the service levels for Clearwire and Sprint Nextel.  He answered affirmatively when asked whether "Clearwire and Sprint Nextel also have

---

[13] *Id.* at 138.

[14] *Id.*  Fischer did not define the size of the purported gap.  Instead, Liberty approximates the size of these areas in its motion for summary judgment based on the propagation maps provided by the Carriers.

[15] Although Fischer uses the term "resident," it is unclear that all residents in the area, including non-T-Mobile customers, would benefit.

[16] *Id.* at 140.  As with the T-Mobile map, Fischer did not testify as to the size of the purported gaps. Liberty claims in its motion for summary judgment that the map indicates MetroPCS does not provide reliable in-building coverage for an irregularly-shaped area approximately three miles long and three miles wide.  *Br. Supp. Mot. Summ. J. of Pl.* at 7.

unreliable or inadequate service in this area."[17]   There are no Clearwire or Sprint Nextel maps in the record of the hearing.  Nor did Liberty include the maps as exhibits to its motions.  Consequently, we cannot determine the location or size of the purported gaps.

Several owners of property near the site testified in opposition to the proposed facility.  The owner of the property across the street, an architect, opposed the use as out of character of the historic residential neighborhood.  Other residents agreed, commenting that the tower would be an eyesore.  A resident who lives about 700 feet from the proposed tower testified that his cellular service from three of the Carriers planning to transmit from the facility is "fine."  Another protestant testified that there is a water tower one-quarter mile from the proposed site.[18]

The Planning Commission also registered its opposition.  Its representative questioned the efforts made by Liberty to find a site in a zoning district that permits the proposed use and also noted that Liberty had not presented any information about "stealthing" the tower to make it less obtrusive, as required by a local zoning ordinance.[19]

The Board unanimously denied Liberty's application for a use variance.  It found that the property is located in an NCR zoning district; it is currently used as permitted by the NCR zoning district regulations; there is a single-family dwelling on the property; and a wireless telecommunications facility "is not a permitted use in the NCR Zoning District."[20] It noted that Liberty "did not introduce any testimony which would indicate that the Property

---

[17] R. 140.  Liberty seems to treat "inadequate" coverage synonymously with "unreliable" coverage.

[18] *Id.* at 169-70.

[19] *Id.* at 171-72.

[20] *Id.* at 185-86.

could not be used as zoned, nor that it was not currently being used as zoned."[21]  None of these findings are disputed.

Based on these findings, the Board denied Liberty's application for a use variance. In its written opinion, the Board noted that Liberty did not meet the requirements under Section 209-77 of the Falls Township Zoning Ordinance to obtain a use variance.  It determined that Liberty failed to demonstrate that "[b]ecause of such physical circumstances or conditions, there is no possibility that the property can be developed for any use permitted within the district or districts or in accordance with the provisions related to the district in which the property is located."[22]  The Board concluded that Liberty "failed to meet the burden of proof required by Section 209-77 of the Falls Township Zoning Ordinance relating to the requirements for the grant of a use variance."[23]

On December 7, 2010, Liberty brought this action appealing the Board's decision.[24] In Count I, it avers that the Board's decision has the effect of prohibiting personal wireless services in violation of § 332(c)(7)(B)(i)(II).  In Count II, it alleges that the Board did not support its decision with substantial evidence in violation of § 332(c)(7)(B)(iii).

On March 18, 2011, after its motion to intervene was granted, the Township filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  The Township argued that Liberty had failed to state a claim for two reasons.  First, the TCA does not permit judicial review of

---

[21] *Id.* at 186.

[22] *Id.* at 187 (quoting Falls Township Zoning Ordinance § 209-77(A)(2)).

[23] *Id.*

[24] Also on December 7, 2010, Liberty filed a land use zoning appeal with the Court of Common Pleas of Bucks County.

individual zoning decisions because doing so would effectively nullify the authority of local zoning boards. Second, the Board's decision does not constitute a blanket prohibition or general ban on personal wireless services. The motion was denied. At the pretrial conference, the parties agreed to rely on the record of the Board hearing. On May 13, 2011, the parties filed cross-motions for summary judgment.

## Legal Standard

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

9

genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotations omitted).

Standards for resolving motions for summary judgment do not change when the parties file cross-motions. *Benckini v. Hawk*, 654 F. Supp. 2d 310, 315 (E.D. Pa. 2009). Although a court may consider cross-motions for summary judgment concurrently, it must resolve the motions independently. *Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa.1993).  The fact that both parties have moved for summary judgment "does not mean that the case will necessarily be resolved at the summary judgment stage," *Atlantic Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 626 (E.D. Pa.1997), or that either party has waived its right to have the case presented to a jury. *Facenda v. N.F.L. Films,* 542 F.3d 1007, 1023 (3d Cir. 2008).

## Discussion

In enacting the TCA, Congress balanced a national policy of fostering telecommunications competition for the benefit of users with traditional local government authority to regulate land use.  While respecting a local government's right to control zoning, it did not grant local governments unlimited power.  Rather, it imposed restrictions on local governmental authority over decisions affecting the location of personal wireless services facilities by imposing procedural and substantive limitations.

Liberty contends that the Board violated a procedural and a substantive requirement.  Procedurally, Liberty argues the Board's decision was not supported by substantial evidence, violating the requirement set forth in 47 U.S.C. §332(c)(7)(B)(iii).[25]

---

[25] "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).

Substantively, it contends that the Board's denial constituted a restriction on the placement of personal wireless service facilities, which has "the effect of prohibiting the provision of personal wireless services" in violation of § 332(c)(7)(B)(i)(II).[26]

In determining whether the decision of a zoning board is supported by substantial evidence, we apply a deferential standard. *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 474 (3d Cir. 1999) ("*APT Pittsburgh*"). We determine *de novo* whether a zoning board's denial of an application to construct a wireless service facility has the effect of prohibiting personal wireless services. *Id.* at 475.

*Substantial Evidence*

Substantial evidence "does not mean a large or considerable amount of evidence, 'but rather such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999) ( "*Ho-Ho-Kus*") (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Substantial evidence is a deferential standard. *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 389 (3d Cir. 2007). The reviewing court "has no power either to weigh the evidence contained in th[e] record or to substitute its own conclusions for those of the fact-finder." *Ho-Ho-Kus*, 197 F.3d at 71 (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

In arguing that the Board's decision was not supported by substantial evidence, Liberty contends the Board did not address Liberty's claims that there is a significant gap

---

[26] "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

in coverage in the area surrounding the proposed facility.  The Township counters that there is substantial evidence supporting the Board's finding that Liberty did not meet the requirements for a use variance under the Falls Township Zoning Ordinance.  After reviewing the record, we conclude that the Board's decision applying the Falls Township Zoning Ordinance denying Liberty's request for a use variance was supported by substantial evidence.

The Board made several findings in support of its denial of Liberty's application.  A wireless telecommunications facility is not permitted on the property without a use variance.  To obtain a use variance, the applicant must meet certain requirements.  Among these requirements, the applicant must demonstrate that "[b]ecause of such physical circumstances or conditions, there is no possibility that the property can be developed for any use permitted within the district or districts or in accordance with the provisions related to the district in which the property is located."[27]  Yet, "[n]o testimony was presented by the appellant [Liberty] indicating that the Property could not be used as zoned."[28]  On the contrary, the property was being used as zoned.  Consequently, the Board denied Liberty's application for a use variance.

According to Liberty, the Board's decision was not supported by substantial evidence because the Board failed to "address all the evidence relevant to Liberty's request for relief, including the tower's status as the least intrusive means of filling multiple carriers' concurrent significant gaps in wireless coverage within the Township."[29]  Liberty

---

[27] R. 187 (quoting Falls Township Zoning Ordinance § 209-77(A)(2)).

[28] *Id.*

[29] *Br. Supp. Mot. Summ. J. of Pl.* at 24.

maintains that the decision was not supported by substantial evidence because it "essentially embraces a single piece of evidence (i.e., the tower's non-compliance with the underlying zoning regulations), while ignoring or failing to resolve the conflict created by the evidence that supports Liberty's application."[30]

We disagree. The Board found that the property was being used as zoned. Liberty did not present any evidence to contradict this finding or to meet the other requirements for a use variance under the Falls Township Zoning Ordinance. In the absence of such evidence, Liberty Towers created no conflict for the Board to reconcile.

More importantly, in urging us to apply the substantial evidence requirement to determinations under the "effects clause," Liberty asks us to conflate two separate and distinct TCA limitations. The Third Circuit has expressly rejected this approach. In *APT Pittsburgh*, the Third Circuit noted that the substantial evidence requirement "is intended to provide procedural protections with respect to determinations of factual issues made by a state or local authority *in the course of applying state and local zoning law*." 196 F.3d at 474 (emphasis added). It held that the substantial evidence requirement is "not applicable to the issue of whether a state's denial of an application to construct a personal wireless service facility [violates the effects clause.]" *Id.* at 475 (citing *Ho-Ho-Kus*, 197 F.3d 64). Accordingly, a local zoning board may, consistent with the substantial evidence requirement, deny an application for a variance based on local zoning law where an applicant fails to demonstrate that the property satisfies the requirements for a variance. *See Ho-Ho-Kus*, 197 F.3d at 71-72 (holding that the reviewing court is to determine

---

[30] *Id.*

whether the zoning board's application of local zoning law is supported by substantial evidence); *accord Nextel Commc'ns of the Mid-Atlantic, Inc. v. Town of Brookline*, 520 F. Supp. 2d 238, 251 (D. Mass. 2007) (holding zoning board's denial of applicant's request for use variance was supported by substantial evidence where "[n]othing in the record suggest[ed] that the Property satisfied any of the specified conditions [for a use variance], and [the applicant] did not attempt to demonstrate that its proposal complied with one or more of the conditions"). Whether such a denial has the effect of prohibiting the provision of personal wireless services is a different question.

We conclude that there is substantial evidence in the record to support the Board's decision to deny Liberty's application for a use variance under local zoning law. Thus, the Township is entitled to summary judgment on Count II of Liberty's Complaint.

### Effect of Prohibiting the Provision of Personal Wireless Services

To establish that an adverse zoning decision has the effect of prohibiting the provision of wireless services, the applicant must prove both that: (1) there is a "significant gap in the ability of remote users to access the national telephone network,"[31] and (2) the proposal "to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *APT Pittsburgh*, 196 F.3d at 480.

How to measure a significant gap in service in the area surrounding the proposed facility is subject to debate. There are two approaches. Some courts focus the inquiry on

---

[31] The "remote user" language derives from *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 642-43 (2d Cir. 1999). The *Willoth* Court, in creating the analysis adopted by the Third Circuit, held that the focus of the TCA is on "whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network." *Id.* at 643. A remote user is a user not physically plugged into the national telephone network. Instead, the remote user relies on a device, such as a cell phone, to send and receive a signal from an antenna, which is connected to the national telephone network.

the carriers seeking to use the facility. Others look at all carriers providing service in the area. Under the user-oriented approach, which the Third Circuit follows, an applicant must demonstrate that "the area the new facility will serve is not already served by another provider." *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 398 (3d Cir. 2003) (sur panel rehearing) (quoting *Penn Twp.*, 196 F.3d at 480), *cert. denied*, 540 U.S. 1108. This approach requires a demonstration that there are no carriers providing service to the area surrounding the proposed facility and the gap in service created by this void is significant.

The "multiple-provider" approach[32] considers the availability of service provided by other carriers irrelevant. *See Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 726 n.8 (9th Cir. 2009). In other words, a gap exists if only one carrier has a significant gap in service in the area near the proposed facility even though a multitude of other carriers have reliable service there. Proponents of this approach contend that it follows congressional intent because it encourages competition among providers and is more likely to ensure better service to customers in a given area. *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 633-34 (1st Cir. 2002).

Liberty argues that we should use the multiple-provider approach, rather than the user-oriented approach adopted by the Third Circuit, because it is the one recently endorsed by the Federal Communications Commission ("FCC"). In 2009, the FCC ruled that "a State or local government that denies an application for personal wireless service

---

[32] This is the approach followed by the First and Ninth Circuits. *See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 733 (9th Cir. 2005); *Second Generation Props., L.P. v. Town of Phelam*, 313 F.3d 620, 633-34 (1st Cir. 2002).

facilities siting solely because one or more carriers serve a given geographic market has

engaged in unlawful regulation that 'prohibits or ha[s] the effect of prohibiting the provision

of personal wireless services,' within the meaning of Section 332(c)(7)(B)(i)(II)." *In the*

*Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to*

*Ensure Timely Siting Review*, 24 FCC Rcd. 13994, 14016 (F.C.C. 2009) (quotation

omitted).    Liberty argues that *Chevron* deference[33] must be given to the FCC's

interpretation, requiring us to apply the multiple-provider approach.    It asserts that

deference is warranted because the Supreme Court made clear that "if a court of appeals

interprets an ambiguous statute one way, and the agency charged with administering that

statute subsequently interprets it another way, even that same court of appeals may not

then ignore the agency's more-recent interpretation." *Levy v. Sterling Holding Co.*, 544

F.3d 493, 502 (3d Cir. 2008) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet*

*Servs.*, 545 U.S. 967, 986 (2005)).[34]

    We need not reject the user-oriented approach in favor of the multiple-provider one

for determining whether a significant gap exists.    The result is the same when applying

either approach.    Liberty has failed to demonstrate that there is a significant gap in service

surrounding the proposed facility.    Thus, we need not address Liberty's *Chevron* deference

---

[33] "*Chevron* established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful. At the first step, we ask whether the statute's plain terms 'directly addres[s] the precise question at issue.' If the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.'" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (quoting *Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 845 (1984)).

[34] One district court in the Third Circuit has followed the approach advocated by Liberty and applied *Chevron* deference to the FCC's 2009 Declaratory Ruling, thus only requiring the applicant to demonstrate a significant gap in coverage by the applicant-carrier, not a gap in coverage from all carriers. *Sprint Spectrum L.P. v. Zoning Bd. of Adjustment of Paramus*, No. 09-4940, 2010 WL 4868218, at *9 (D.N.J. Nov. 22, 2010).

argument, leaving it for the Third Circuit to decide in another case.

There are no magic numbers or percentages that constitute a significant gap. Neither the TCA, the FCC, nor the courts have established the "significant gap" threshold. Hence, each case must be viewed on its own.

To determine if a significant gap in coverage exists, district courts in the Third Circuit consider the quality of the service in the area and the effect on the users. *Am. Cellular Network Co. v. Upper Dublin Twp.*, 203 F. Supp. 2d 383, 389 (E.D. Pa. 2002). District courts examine a number of factors when determining whether a significant gap exists, *Ho-Ho-Kus*, 197 F.3d at 70, n.2, including call drop or failure rates and the number of people affected by the gap. *Am. Cellular Network Co.*, 203 F. Supp. 2d at 389.[35]

There are qualitative and quantitative components of the significant gap calculus. The qualitative test measures the quality of cellular service, asking whether the service is sufficiently poor. *Id.* It assesses how reliable the service is, taking into consideration the rate of dropped calls as well as signal strength. *See, e.g., New Cingular Wireless PCS, LLC v. Zoning Hearing Bd. of Weisenberg Twp.*, No. 06-2932, 2009 WL 3127756, at *8 (E.D. Pa. Sept. 29, 2009) ("[C]ourts in this Circuit have routinely analyzed the percentage of adverse call results in determining whether a significant gap exists."). The quantitative measurement looks at the number of users affected by the purported gap in service. *Am. Cellular Network Co.*, 203 F. Supp. 2d at 389.

In pressing its case before the Board, Liberty relied on maps prepared by each of

---

[35] The Third Circuit has not specified what factors a district court should examine in determining whether a significant gap exists. The court did advise "it matters a great deal, however, whether the 'gap' in service merely covers a small residential cul-de-sac or whether it straddles a significant commuter highway or commuter railway." *Ho-Ho-Kus*, 197 F.3d at 70, n. 2.

the four Carriers to show that coverage levels varied from reliable in some areas and unreliable in other areas.  It did not present any evidence demonstrating the degree of reliability.  Instead, without precisely defining reliability and unreliability, it presented mere conclusions without any factual bases supporting those conclusions.

Liberty asserts that MetroPCS and T-Mobile do not provide reliable in-building coverage for an irregular-shaped area approximately three miles long and three miles wide and another area one mile long and two miles wide, respectively.  The T-Mobile map indicated three thresholds of coverage based on what T-Mobile considers reliable.  The map marks an area where T-Mobile provides reliable in-vehicle coverage, and thus unreliable in-building coverage, and a small area of "unreliable coverage," which includes a portion of Lower Morrisville Road.[36]  The exact contours of this area are difficult to determine.  For instance, some of the white pixels indicating "unreliable coverage" appear to abut, but not straddle, the road.

The MetroPCS map contains a considerably larger white area that, based on Fischer's testimony, corresponds to an area of "unreliable coverage."  Whether this is unreliable for in-building use only, or for any use, is unclear.  The map does not contain a legend and does not follow the same three-part threshold scheme that the T-Mobile map does.  Moreover, Fischer's testimony and expert report contains little to assist us in interpreting the MetroPCS map.

Fischer claimed that "Clearwire and Sprint Nextel also have unreliable or inadequate

---

[36] Fischer's report indicates that reliable coverage "is defined to be the ability of a remote user of wireless services to connect with the landbased national telephone network and to maintain a connection capable of supporting a reasonably uninterrupted communication."  R. 43.  However, there is no data in the record indicating the number or percentage of dropped or failed calls in the areas the Carriers denominate as "unreliable."

service in this area."[37]  However, Fischer did not testify to the size of this gap and there is no map in evidence.  Consequently, it is not possible to determine the size of Clearwire or Sprint Nextel's gap or where the gaps are located.

Because it did not provide any data quantifying the rate of dropped calls or call failures for the four Carriers or any other carrier, Liberty has not established that the quality of service is sufficiently poor to constitute a significant gap.  The pixilated propagation maps provided by two of the four carriers and the conclusory testimony based on these maps do not make out a significant gap.  Liberty presented no additional data collected through any testing of the area, such as drive tests measuring signal strength and call failure rates.

In *American Cellular Network Co.*, an applicant used an automated system that made numerous calls during a drive test to measure call failure rates and signal strength. 203 F. Supp. 2d at 394.  Because the data revealed a ten percent call failure rate, the court held that the applicant demonstrated that wireless service was sufficiently poor.[38]  *Id.*; *see also Liberty Towers, LLC v. Zoning Hearing Bd of Twp. of Lower Makefield*, No. 10-1666, 2011 WL 3496044, at *13 (E.D. Pa. Aug. 9, 2011) (holding Liberty failed to demonstrate a significant gap in neglecting to introduce data regarding dropped or failed calls).  Absent information connecting the area of reliable in-vehicle coverage to a call drop or failure rate for users in buildings, or call drop or failure rates for T-Mobile customers traveling in the area of Lower Morrisville Road, we are unable to determine that a

---

[37] R. 140.

[38] The court relied on this data despite a propagation map, such as the maps at issue here, indicating reliable in-building coverage because, according to the applicant's expert, "[a] propagation report does not have the same level of accuracy or reliability as an actual drive test."  *Id.*

19

significant gap exists.

Neither has Liberty met its burden to show that the proposed facility is the least intrusive.  Proving that there is a significant gap is not enough.  The applicant must also show that the proposed facility is "the least intrusive on the values that the denial sought to serve."  *Omnipoint Commc'ns Enters.,* 331 F.3d at 398.   The applicant must make a good faith effort to find less intrusive alternatives, such as less sensitive sites, alternative system designs, alternative tower designs, and placement of antennas on existing structures.  *Id.*  Thus, Liberty must demonstrate that the proposed location and design of the facility renders it the least intrusive.

Liberty claims that it identified three areas where the tower would be permitted as a conditional use.  In two of these areas, Liberty claims it considered the properties as potential tower sites and contacted the owners, but none of them expressed any interest in housing the tower.  Seidel did not offer any details about the discussions.  The third property was the school adjacent to the proposed site.  Seidel testified that "[C]atholic churches and [C]atholic schools generally are not open to the option of placing towers on their properties."[39]  Fischer's report claims that Liberty chose the property at issue "due to the location to best fulfill the coverage objectives  and also balancing other factors such as implementation, access, visibility, etc., to fulfill the coverage objectives in the least intrusive means possible for Falls Township."[40]  Neither in his report nor his testimony did he quantify these objectives or how the factors were balanced.

---

[39] R. 112.

[40] *Id.* at 44.

It is unclear why the Carriers could not use the 130-foot water tower or 60-foot monopole near the property. According to Fischer, T-Mobile and MetroPCS transmit in the "upper frequency wards," and "looking for anything outside of the two miles wouldn't really help serve them in this situation."[41] Yet, based on a map provided by Liberty, the water tower is less than three-quarters of a mile from the proposed location. There is no evidence that Liberty or the Carriers contacted the owner of the water tower to determine if they could place their antennas on that structure. Moreover, the monopole owned by T-Mobile is less than a mile from the site. The record is silent on the issue of whether placement on either of these structures would improve or enhance reliability to the extent it would fill the purported gap in coverage.

Liberty claimed that the water tower is too short. However, the water tower is only fifteen feet shorter than the 145-foot mark where T-Mobile would place its antenna on the proposed monopole. Why T-Mobile could not extend its antenna fifteen feet higher than the top of the water tower is unclear. Liberty's maps demonstrate that AT&T, Clearwire, and Sprint Nextel transmit from a 150-foot water tower less than two and a half miles from the proposed facility. Similarly, Liberty failed to provide any information about the possibility of extending the 60-foot monopole to allow the Carriers' signal to transmit to the area around the proposed location.

Liberty also claims that the monopole is the least intrusive because Fischer's report indicates it is the lowest possible height. While this may be true, Liberty has provided no evidence that it considered other tower designs or means to make the tower less intrusive

---

[41] *Id.* at 135.

on the area.  In registering the Falls Township Planning Commission's opposition to the monopole, a representative from the Commission noted that although the Township Ordinance requires that towers be "stealth," Liberty presented no information or options about "stealthing" the monopole.[42] *See Am. Cellular Network Co.*, 203 F. Supp. 2d at 396-97 (holding that company's flexibility as to how it would design the pole to make it more aesthetically pleasing supported its claim that it was the least intrusive alternative).  In light of these deficiencies, Liberty has failed to meet its burden to demonstrate that the proposed site is the least intrusive alternative.

## Conclusion

The Township's application of local zoning law to deny Liberty's application for a use variance was supported by substantial evidence.  Liberty's claim under the effects clause also fails because it did not demonstrate that a significant gap exists and that the proposed facility's location and design is the least intrusive means to fill that gap.  Therefore, we shall deny Liberty's motion and grant the Township's motion.

---

[42] *Id.* at 172.